**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE SIXTH CIRCUIT**

DOUGLAS PFENNING

     Plaintiff – Appellant

     v.

LIBERTY LIFE ASSURANCE COMPANY OF BOSTON

     Defendant – Appellee

**On Appeal from the United States District Court**

**for the Southern District of Ohio, Western Division,**

**at Dayton**

**Case No. 3:14-CV-471**

---

**CORRECTED REPLY BRIEF OF APPELLANT, DOUGLAS PFENNING**

---

Joseph P. McDonald (0055230)
McDonald & McDonald Co., L.P.A.
200 E. Spring Valley Rd., Suite A
Dayton, OH 45458
Ph.: (937)428-9800; Fax: (937)428-9811
joseph@mcdonaldandmcdonald.com
Attorneys for Plaintiff-Appellant

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF CONTENTS                                                                        ii

TABLE OF AUTHORITIES                                                                   iii

THE FACTS OFFERED BY APPELLEE ARE NOT ACCURATE           1

ARGUMENT                                                                                      7

      THE CALIFORNIA INSURANCE CODE DOES APPLY TO
      THE POLICY IN THIS CASE AND PFENNING IS ENTITLED
      TO *DE NOVO* REVIEW                                                            7

      LIBERTY LIFE DID NOT EVALUATE PFENNING'S MEDICAL
      EVIDENCE AND IMPROPERLY CONCLUDED THAT HE
      RETAINED AN ABILITY TO WORK                                          12

      LIBERTY LIFE DID NOT PROPERLY DETERMINE THE
      DEMANDS OF APPELLANT'S OCCUPATION BECAUSE IT
      IGNORED THE SPECIFICS OF ITS OWN POLICY AND THE
      REMAINING PHYSICAL CAPABILITIES OF APPELLANT .      18

CONCLUSION                                                                                 25

CERTIFICATION OF FRAP 32(a)(7)(B) COMPLIANCE                   27

CERTIFICATE OF SERVICE                                                         27

APPELLANT'S 6 CIR. R. 30(b) DESIGNATION OF RELEVANT
DISTRICT COURT DOCUMENTS                                                 28

# TABLE OF AUTHORITIES

**CASES**                                                          **PAGE**

*Benningfield v. Hartford Life & Accident Ins. Co.*,
4:11-cv-00087-JHM (WDKY, June 21, 2012)                            Pg. 22

*Bishop v. Aetna Life Ins. Co.*, 5:15-cv-104-KKC
(EDKY, Feb. 12, 2016)                                              Pg. 22, 23,
                                                                  24

*Cannon v. PNC Financial Services,* Case No. 15-6010,
(6th Cir. 2016)                                                   Pg. 16

*Comerica Bank v. Lexington Ins. Co.,* 3 F 3d 939, 942
(6th Cir.1993)                                                    Pg. 9

*Conkright v. Frommert*, 559 US 506 (2010)                        Pg. 10

*Frazier v. LINA*, 725 F 3d 560 (6th Cir. 2013)                   Pg. 18, 19

*Helfman v. GE Group Life Assur. Co.*, 573 F 3d 383, 395-396
(6th Cir. 2009)                                                   Pg. 15

*Kalish v. Liberty Life*, 419 F 3d 501 (6th Cir. 2005)            Pg. 12

*King v. Liberty Life*, Case CV-15-1806-JFW (Central Dist. of Cal.,
Doc. 19, June 1, 2015)                                            Pg. 8

*Lasser v. Reliance Standard Ins. Co.*, 344 F 3d 381, 386
(3d Cir. 2003), *cert. denied*, 541 US 1063, 124 S. Ct. 2390,
158 L.Ed. 2d 963 (2004)                                           Pg. 20

*Metlife v. Conger*, 474 F 3d 258, (6th Cir. 2007)                Pg. 12

*Metropolitan Life Ins. Co. v. Glenn*, 554 US 105 (2008)     Pg. 17, 22

*Neaton v. Hartford Life & Accident Ins. Co.*, 517 F App'x 475,
485 (6th Cir. 2013)     Pg. 22

*Niswonger v. PNC Bank Corp, et al.*, Case No. 13-4282,
(6th Cir., May 14, 2015)     Pg. 12, 14

*Osborne v. Hartford Life & Accident Ins. Co.*, 465 F 3d 296 (2006)     Pg. 20

*Regents of Univ. of Mich. v. Empls. Of Agency Rent-A-Car Hosp.,
Ass'n.*, 122 F 3d 336, 339-40 (6th Cir. 1997)     Pg. 9

*Rickey Granger v. Life Ins. Co. of North America*,
Case No. 6:14-cv-1820, (Middle Dist. of Florida, March 28, 2016)     Pg. 11

*Rochow v. LINA*, 482 F 3d 860 (6th Cir. 2007)     Pg. 16

*Rowan v. Unum Life Ins. Co.*, 119 F 3d 433, 435 (6th Cir. 1997)     Pg. 9

*Shaw v. AT&T Umbrella Plan No. 1*, 795 F 3d 238, (6th Cir. 2015)     Pg. 12, 14

*Shelby Co. Healthcare v. Majestic Star Casino*, 581 F 3d 355,
373-374 (6th Cir. 2009)     Pg. 26

*Stockman v. GE Life, Disability and Medical Plan*, *et al*,
Case No. 13-4450, (6th Cir., 2015, unpublished)     Pg. 9

*Varity Corp. v. Howe*, 516 US 489, 514 (1996)     Pg. 17

## STATUTES

California Statute § 10110.6(a)        Pg. 7, 10

29 CFR § 2560.503-1(b)(5)        Pg. 8

California Statute § 10110.6(g)        Pg. 11

Illinois Statute § 2001.3        Pg. 11

## THE FACTS OFFERED BY APPELLEE ARE NOT ACCURATE

The Defendant offers several facts.  Some of those facts are correct.  Some of them are not correct and some of them are *post hac* rationalizations that are not capable of supporting the denial of benefits in this case.  Facts offered by Defendant are found between page 3 and page 23 of their brief.  It is not necessary to take apart each fact but it becomes important to understand where some of the Defendant's offerings are completely inaccurate.  Inaccuracies are found as follows:

### Inaccuracy 1:

Defendants offer the idea that, "The record here consists of the claim file and the policy, plan and Summary Plan Description only."  (Doc. 19, pg. 11) In reality, the administrative record in this case is confined to the claim file and the policy that Liberty Life issued to the Farmers Group, Inc.  There are no plan documents before this Court.  There is no Summary Plan Description in the record filed by the Defendants.

### Inaccuracy 2:

The Defendant offers, "Importantly the policy language does not say 'own job' or 'any job' but instead says, 'own occupation' or "any occupation' when determining eligibility for disability benefits (Doc. 19, pg. 12).  This is inaccurate.  The exact definition of disability references that a covered person is, "unable to

perform <u>all of the material and substantial duties of *his* occupation</u> on an <u>Active Employment</u> basis because of Injury or Sickness."  The definition of Active Employment is that the employee is actively at work for the Sponsor, which is Farmers Group, Inc. (RE 9, LL 5 for exact definition).

**<u>Inaccuracy 3:</u>**

The Appellee also offers to this Court that the Farmers Group, Inc. job description, "…does not describe hours of driving and constant climbing on roofs as Mr. Pfenning would have the Court believe." (Doc. 19, pg. 13)  In reality, the job description provided by Farmers indicates, "Employees assigned to the catastrophe team will be required to travel away from their residence for a specified period of time, usually consisting of 23 days." (RE 9, LL 528)  The same job description requires, "inspects damaged property and vehicles and determines claims related damage", and includes carrying up to 50 lbs. as well as climbing, reaching and standing.  (RE 9, LL 528)

**<u>Inaccuracy 4:</u>**

In regard to the work done by Liberty Life's own vocational employee, Amanda Voce; Liberty Life offers that, "She noted that Mr. Pfenning's Farmers Insurance job description was used to determine which occupation was best represented by that description." (Doc. 19, pg. 14)  In the Occupational Analysis completed by Ms. Voce, she distilled Mr. Pfenning's actual job description down

to only this: "Investigates, determines liability, confirms coverage, establishes damages, and negotiates settlement of claims. Will also be required to maintain active insurance adjusters license in states where required." (RE 9, LL 424)[1]

**Inaccuracy 5:**

Appellee attacks vocational expert Mark Pinti by arguing that he ignored, "all nationally recognized sources, such as DOT or SOC/O*NET and refusing to determine Mr. Pfenning's "occupation", Mr. Pinti decided, without anything more than his own gut feeling, that Mr. Pfenning's job should be categorized as medium level work." (Doc. 19, pg. 10) In Mr. Pinti's vocational report, he noted that the job description required, "Bending, sorting, pulling, carrying up to 50 lbs., pushing, speaking, climbing, reaching, standing, key entry, reading, kneeling, seeing and writing." (Re 9, LL 153) Mr. Pinti indicated that based upon the DOT description of the physical demands that Mr. Pfenning's job was at least performed at a "medium" level of physical demand (RE 9, LL 153). See 20 CFR § 404.1567(c) for definition of medium work.

**Inaccuracy 6:**

The Defendant further attacks Mr. Pinti by suggesting that he was "biased" and he refused to accept medical evidence. The Defendant argues, "But Mr. Pinti disagreed anyway, underlining his bias and refusal to accept the medical evidence

---

[1] It is unclear why Ms. Voce did not discuss the travel requirements of the job or the ability to lift 50 lbs. while performing the work in the field.

or to review Mr. Pfenning's occupation using any resource. Mr. Pinti did not conduct the FCE, of course, but thinks he knows more than the doctor who did. In fact, Mr. Pinti did not even review any medical records other than Dr. Wickstrom's FCE – which Mr. Pinti disagreed with anyway." (Doc. 19, pg. 15-16) A close reading of Mr. Pinti's report indicates that he did not disagree with Dr. Wickstrom but purely noted that based upon the findings within the FCE that sedentary work was extremely unlikely. At relevant part in his opinion, he notes,

> "Although Dr. Wickstrom intimated that Mr. Pfenning may be capable of performing sedentary work, it is noteworthy that within the findings of the FCE, is the fact that Mr. Pfenning's finger dexterity, manual dexterity, ambulation agility, ambulation stamina, climbing ability and keyboarding speed is "very low." Those findings would indicate that the probability that Mr. Pfenning is capable of even sedentary work is extremely remote." (RE 9, LL 154)

**Inaccuracy 7:**

In an effort to enhance the believability of the secondary work done by Liberty Life's vocational employee, Michelle Reddinger, Liberty Life offers the following: "Unlike Mr. Pinti's report, which did not even undertake to analyze what Mr. Pfenning's own occupation would entail, Ms. Reddinger's references from the DOT match up completely with the job duties found in the Farmers Insurance job description." (Doc. 19, pg. 17) While it is true that Ms. Reddinger did a more complete analysis of the job description than Ms. Voce ever did, the DOT references do not, "match up completely" with the job duties found in the

Farmers description. The only thing Ms. Reddinger actually accomplished was identifying how the DOT describes a level of work. We must keep in mind that this policy requires that the work be performed for the Plan Sponsor in a manner that is consistent with the Plan Sponsor's goals. Ms. Reddinger completed no such review and Ms. Reddinger also did not ever reference any medical reports that she relied upon to determine Mr. Pfenning's capability.[2] (RE 9, LL 91-95)

Additionally, Ms. Reddinger makes no mention of the extremely low capabilities in handling, fingering and keyboarding which would be consistent with the skilled sedentary and light DOT titles of Claim Adjuster.

**<u>Inaccuracy 8</u>**:

In their analysis of medical evidence, Liberty Life indicates that it carefully considered all of the medical evidence, but then offers errant statements like, "Dr. Pugar stated that he believes that Mr. Pfenning has 'probable MS' based upon inconclusive findings on punch biopsy and MRI scans." (Doc. 19, pg. 26) In fact, if Liberty Life were as careful with medical evidence as it wants this Court to believe, it would note that Dr. Pugar only determined the diagnosis of "probable MS" following a testing of Mr. Pfenning's cerebral spinal fluid on April 9, 2014

---

[2] Both Ms. Reddinger's report and Ms. Voce's report do not articulate what medical evidence they were told by Liberty Life to rely on when determining whether or not Mr. Pfenning was a reasonable fit.

(RE 9, LL 247).  Also see Pugar office note June 12, 2014 (RE 9, LL 244-245), (enough evidence to support probable MS).

**Inaccuracy 9:**

Finally, the Appellee notes, "Dr. White found the self-reported symptomology may be unreliable as treating doctors had difficulty getting a diagnosis which was evident during the FCE.  Specifically, during push pull strength testing and walk velocity test, the inconsistent findings caused Dr. Wickstrom to indicate, 'unsure.'" (Doc. 19, pg. 26)  The Appellee fails to tell this Court that Dr. Wickstrom said that Pfenning provided a good effort and even if there were perceived inconsistencies on push pull strength testing and walk velocity testing, it certainly would not undermine the capabilities that were described as "very low", such as ambulation, manual dexterity and keyboarding speed.  Also, it seems curious that the Appellee offers this comment from Dr. White because it did not seek an Addendum from Dr. White relative to the confirmed diagnosis of Multiple Sclerosis.  Liberty Life did obtain an Addendum from reviewing physician, Dr. Lang, but it is unclear why they did not seek an Addendum from Dr. White after the diagnosis was confirmed.

# ARGUMENT

## THE CALIFORNIA INSURANCE CODE DOES APPLY TO THE POLICY IN THIS CASE AND PFENNING IS ENTITLED TO *DE NOVO* REVIEW.

In their argument, Liberty concedes that the version of 10110.6(a) in Appellant's brief, is correct and also that the California statute banning discretionary language survived preemption. Liberty, finally agrees that California's choice of law provision in its policy is valid (Doc. 19, pg. 29). Lastly, the Defendants also agree that the Illinois statute which bans discretionary language in disability policies is "plain and straightforward." (Doc. 19, pg. 29)

The thrust of Defendant's argument regarding the inapplicability of California's ban on discretion to this case is supported by labeling it as, "oddball" and by trying to argue that the *administrative record* does not show coverage of a California resident (Doc. 19, pg. 30).

While it is true that the *administrative record* does not discuss coverage of persons other than Mr. Pfenning; it was Liberty Life, who directed Mr. Pfenning to the California Department of Insurance when it denied his claim (RE 9, LL 341-346). It seems odd that the proof of insuring other California residents would be inside any individual administrative record. This unusual defense makes Appellant wonder if Liberty Life knows who it is insuring? In this case, Liberty Life negotiated with Farmers, a California corporation, to insure all of its, "full-time and part-time Active Employees", across the United States. (RE 9, LL03) Indeed,

the named insured and all of the associated companies are located in California (RE 9, LL 03).  Nonetheless, it is true that the policy does not show that any other natural person is a California resident.  If the record only concerns Appellant and his claim for benefits, how does he prove any other California resident is an insured under the plan?  The answer is by judicial notice and legal pleadings.  The District Court was aware of the case law cited by Appellant but failed to understand that legal pleadings offered to the Court clearly demonstrated that another California resident was insured under the Farmers' group benefit plan.

This Court should look to *King v. Liberty Life*, Case CV-15-1806-JFW (Central Dist. of Cal., Doc. 19, June 1, 2015), (Response, RE 16, Ex. 3, Page ID 773-779).  In *King*, the parties before the District Court agreed that Ms. King was employed by Farmers and was a plan participant in the group disability income policy insured by Liberty Life and that the standard of review was *de novo*!

The *King* pleading is evidentiary support for Appellant's entitlement to *de novo* review.

The Defendant's argument for avoiding California's ban on discretionary clauses is misplaced and contrary to established law.  In order to maintain a reasonable claim procedure, Liberty Life has an obligation to comply with the Code of Federal Regulations.  At 29 CFR § 2560.503-1(b)(5), the regulation requires that, "…benefit claim determinations are made in accordance with

governing plan documents and that, where appropriate, *that plan provisions have been applied consistently with respect to similarly situated claimants*."

The analytical method of interpreting ERISA contracts demonstrates that established precedent from this Court will dictate applying the ban as written because it is the result intended by the parties.  In *Stockman v. GE Life, Disability and Medical Plan*, *et al*, Case No. 13-4450, (6th Cir., 2015, unpublished), a *per curium* opinion laid out the Federal Common law in a *de novo* review of an AD&D policy.  The court noted,

> "This de novo standard of review applies to the plan administrator's factual determinations as well as his legal conclusions.  See *Rowan v. Unum Life Ins. Co.*, 119 F 3d 433, 435 (6th Cir. 1997).
>
> The language in an insurance policy 'is to be given its ordinary meaning unless it is apparent from a reading of the whole instrument that a different or special meaning was intended.' *Comerica Bank v. Lexington Ins. Co.,* 3 F 3d 939, 942 96th Cir. (1993). 'The terms of an ERISA plan [are to] be interpreted in an ordinary and popular sense, and any ambiguities in the language of the plan [are to] be construed strictly against the drafter of the plan.' *Regents of Univ. of Mich. v. Empls. Of Agency Rent-A-Car Hosp., Ass'n.*, 122 F 3d 336, 339-40 (6th Cir. 1997)  'A technical construction of a policy's language which would defeat a reasonable expectation of coverage is not favored…[and] an insurer has a duty to express clearly the limitations in its policy.' *Id.* at 339
>
> However, we have the 'paramount responsibility in construing plan language…to ascertain and effectuate the underlying intent.' *Id.* Therefore, we must first reference the plan language itself, but may also consider reasonable inferences and presumptions under the particular circumstances of the claim." *Id.* at ___.

Under the above precedent, the burden largely falls to the Defendant-Appellee to clarify its treatment of the beneficiaries. While the Defendant-Appellee believes that Appellant is relying upon, "arm waving, italics, exclamation points…", to advance its argument, perhaps the better question is what did Liberty Life intend towards the Farmers' employees across the nation and what clear intention did it describe in those jurisdictions which do not ban discretion?

The reasoning advanced by Appellee is chaos! Ms. *King* and Mr. *Pfenning* are insured under the same plan issued by Liberty Life. Two different lawyers both representing Liberty argue two different outcomes based largely on Mr. Pfenning's address. The argument offered by Appellee runs contrary to the established goals of ERISA, to wit: efficiency, predictability and uniformity. See *Conkright v. Frommert*, 559 US 506 (2010).

It is regrettable that the District Court tripped over the, "any California resident", language in the discretionary ban, but it is clear that the District Court and the Appellee both do not appreciate the plain text of the California statute and the net effect of the operation of California's law.

The plain text of California Insurance Code 10110.6(a) does not require that the individual seeking its protection be a resident of California. A clear and plain reading conveys the idea that if a policy insures any California resident, it cannot

contain any discretionary language <u>as a matter of law</u>. See § 10110.6(g), (any discretionary language is void and unenforceable if found in a policy).

Therefore, Appellee seems to be arguing that a tiny bit of discretionary language is saved for the unfortunate members of the Farmers Group Insurance family of employees who live outside of California. This Court should force Liberty Life to explain how this result is possible with the standard policy contained in the administrative record. The language authorizing Liberty Life's interpretation is missing and therefore, the argument against providing *de novo* review must fail.

A District Court in Florida recently entertained a similar issue and decided upon applying the Illinois statutory ban to a long-term disability claim of a Florida resident. In *Rickey Granger v. Life Ins. Co. of North America*, Case No. 6:14-cv-1820, (Middle Dist. of Florida, March 28, 2016), Judge Carlos Mendoza considered a claim by an insurance adjuster employed by State Farm (an Illinois Corporation) but who resided in and worked in Florida for his employer. The Defendant's argued against *de novo* review as required by Illinois statute § 2001.3. The court resisted the Defendant's argument and applied Illinois law and gave Mr. Granger a *de novo* review of his claim denial. The court stated,

> "…Defendant has not shown why a law prohibiting a grant of discretionary authority is contrary to public policy in Florida. Defendant has not cited any authority for the proposition that Florida disapproves of such laws; citing the absence of an express

law similar to section 2001.3 is not sufficient."

The final question for this Court is why Pfenning's case would have a different outcome than Mr. Granger's case? *De novo* review is what is contemplated under California law and Liberty Life's contract with Farmers. Pfenning should get the review his employer bargained for. Liberty Life offers no valid reason why he can't have a *de novo* review. The District Court erred on the standard of review issue and this Court should reverse its finding!

## **LIBERTY LIFE DID NOT EVALUATE PFENNING'S MEDICAL EVIDENCE AND IMPROPERLY CONCLUDED THAT HE RETAINED AN ABILITY TO WORK.**

On pages 30 and 31 of Doc. 19, Liberty Life offers the idea that it carefully reviewed the medical evidence. In their careful review, they take the opportunity to offer the following, "If, as Mr. Pfenning claims, all specialists who provide medical opinions to Liberty Life are suspect and should be discounted, then all claims for benefits where a treating physician believes that a disability (any definition) existed, would almost be upheld." (Doc. 19, pg. 30)

The primary reason why Liberty Life's reviewers are suspect and should be discounted is based upon their treatment of the evidence presented to them. See *Metlife v. Conger*, 474 F 3d 258, (6th Cir. 2007); *Shaw v. AT&T Umbrella Plan No. 1*, 795 F 3d 538, (6th Cir. 2015); *Kalish v. Liberty Life*, 419 F 3d 501 (6th Cir. 2005); and *Niswonger v. PNC Bank Corp, et al.*, Case No. 13-4282, (6th Cir., May

14, 2015), (peer reviewers who disregard evidence or selectively review evidence do not engage in a reasoned process and any denial of benefits based upon such review is arbitrary).

Initially, Dr. Frisso Potts, Liberty Life's employee reviewer, only examined medical records when he speculated on a capacity for work. He did not have the benefit of a confirmed diagnosis of Multiple Sclerosis and therefore his speculation about capacity for work is incomplete.

In addition, Dr. Potts' report fails to award any credibility to the January 2014 findings of the physical therapist, who actually worked with Pfenning. The therapist noted:

> "Patient reports that he has decreased sensation to pinprick and light touch. Patient reports that his balance is also effected. Patient reports that his gait is slow. Patient reports a history of uncontrolled hypertension." (RE 9, LL 318)

The same physical therapist completed actual testing which revealed that Pfenning's movement from a seated position took over 20 seconds and that Pfenning lost his balance rapidly and had clinically observable impaired sensation to light touch, perception and vibration (RE 9, LL 320-321). Dr. Potts concluded that Pfenning was, "limited to standing and walking on occasion and climbing ladders and that a banister would be needed to climb stairs." (RE 9, LL 367) Why didn't Dr. Potts discuss Mr. Pfenning's poor balance, poor sensory skills and clear

difficulty arising from a chair? These deficits would certainly impact the performance of any work effort!

Dr. Potts did not embrace the limitations which were clinically articulated during physical therapy and, therefore, offering contrary limitations without a physical examination, places doubt upon his findings.

Likewise, the file reviewers who were hired by Liberty Life to review Pfenning's appeal suffered from a willingness to cast aside valuable evidence without articulated reasons. Dr. Lang and Dr. White both discussed the FCE but both indicated that it was totally unreliable because of small inconsistencies (RE 9, LL 116; RE 9, LL 119).

Isolated inconsistencies in Pfenning's performance did not and could not manifestly cause *all* of the data from the FCE to be unusable. See *Shaw supra at 549* and *Niswonger supra.*

By rejecting the FCE in its entirety, each reviewing physician behaved arbitrarily towards the evidence that Pfenning produced. Indeed, each reviewer had the ability to call Dr. Wickstrom if they were concerned. Neither reviewer did so.

Instead of investigating any perceived inconsistency, the peer reviewers were pleased to engage in a game of character assassination without the benefit of an exam. Dr. Long stated, "These inconsistencies make the self reported

symptoms, memory difficulties and physical difficulties all suspect." (RE 9, LL 115)  Dr. White implied less than a full effort when she stated, "It is uncertain whether or not Mr. Pfenning displayed full effort throughout testing due to numerous inconsistencies."  (RE 9, LL 119)  These are strange comments when the FCE examiner noted that Mr. Pfenning was "cooperative" and Dr. Wickstrom did not invalidate his own results by expressing concerns over Pfenning's poor performance.  See *Helfman v. GE Group Life Assur. Co.*, 573 F 3d 383, 395-396 (6th Cir. 2009), (credibility determination without benefit of a physical exam is arbitrary).

Finally, in the ultimate act of arbitrary behavior, Liberty Life failed to consider the actual findings on the FCE relative to the ability to work at his occupation. In his FCE, Dr. Wickstrom found that Pfenning had very low capabilities in 1) ambulation agility; 2) ambulation stamina; 3) climbing; 4) keyboarding speed; 5) finger dexterity; and 6) manual dexterity (RE 9, LL 177). These clinical findings are inconsistent with the performance of work.  In this case, the proposed occupation would have been classified as skilled and sedentary to light in physical demand.  It remains unclear how Liberty Life is behaving in a manner consistent with its fiduciary duty when it ignores the specific findings regarding Pfenning's subpar handling, keyboarding and agility and declares Pfenning to be fully capable to perform skilled sedentary to light work of claim

adjusting.  See *Cannon v. PNC Financial Services,* Case No. 15-6010, (6th Cir. 2016), *per curium* (failing to consider diagnosis and effects is arbitrary).

At the beginning of their argument, Appellee offers the following, "Mr. Pfenning filed a disability claim with Liberty Life under the policy based on the diagnosis of idiopathic peripheral autonomic neuropathy and lumbosacral neuritis NOS." (Doc. 19, pg. 8)  When Mr. Pfenning's diagnosis moved from generalized to specific (Multiple Sclerosis), Liberty Life and its reviewers continued to operate under the delusion that Multiple Sclerosis (MS) was not present.  The diagnosis of probable MS only occurred after Mr. Pfenning's cerebral spinal fluid was tested. See *Cannon supra* and *Rochow v. LINA*, 482 F 3d 860, 865-866 (6th Cir. 2007), (exact diagnosis not needed but must prove an inability to perform duties).

It is clear from the record that Dr. Pugar embraced "probable MS", only after the results of the cerebral spinal fluid test (RE 9, LL 244-245). Nonetheless, in their brief, the Appellee offers this untrue statement:  "Dr. Pugar stated that he believes Mr. Pfenning has 'probable MS' based still on inconclusive findings on the punch biopsy and MRI scans." (Doc. 19, pg. 26)  The Defendant knows that the diagnosis of MS became more evident as a result of the cerebral spinal fluid testing, but it continues to offer a distorted view to this Court.

When Liberty's file reviewer, Dr. Lang, was confronted with the cerebral spinal fluid testing, Dr. Lang switched his opinion from diagnosis symptoms and

limitations to generalized statements regarding sustained functionality. It does little for Pfenning to have Liberty Life rely upon a statement from Dr. Lang, such as, "A diagnosis or disease state alone does not necessarily imply functional impairment, restrictions or limitations."  (RE 9, LL 71)  Thus, Dr. Lang avoided the recognition that all of the things that Pfenning was complaining about prior to, now fit the larger paradigm of an established case of Multiple Sclerosis.  In his Addendum, Dr. Lang had one final opportunity to go back over the clinical evidence and clinical history in this case, but he chose not to. Dr. Lang had ample evidence which would suggest that it would be appropriate to fully endorse the FCE limitations which were discovered on actual clinical testing with Dr. Wickstrom now that a diagnosis of MS was established.  By refusing to consider that his symptoms were produced by Multiple Sclerosis, Liberty Life's reviewers once again demonstrate that they are not entitled to credibility; that they are suspect; and their opinions should be discounted.[3]  See *Metropolitan Life Ins. Co. v. Glenn*, 554 US 105, 111 (2008) and *Varity Corp. v. Howe*, 516 US 489, 514 (1996), (a benefit determination is a fiduciary act and the plan owes a duty of loyalty.  Claims

---

[3]The District Court failed to understand the medical evidence and injected a requirement that the medical evidence be "objective"  See District Court Doc. 17, p. 21; Pg.ID# 804.  No requirement of "objective" evidence is noted in the policy and none of Liberty Life's reviewers note a lack of objective evidence.  This is further evidence of the District Court's lack of analysis in this claim.

administration is not an adversarial process and is conducted solely in the interests of participants and fiduciaries).

## LIBERTY LIFE DID NOT PROPERLY DETERMINE THE DEMANDS OF APPELLANT'S OCCUPATION BECAUSE IT IGNORED THE SPECIFICS OF ITS OWN POLICY AND THE REMAINING PHYSICAL CAPABILITIES OF APPELLANT.

In support of its vocational position, Liberty Life offers *Frazier v. LINA*, 725 F 3d 560 (6th Cir. 2013), as the model for their vocational analysis. The definition in *Frazier* was offered by the Plaintiff (Doc. 17, pg. 45) to describe a different type of language that <u>does not</u> appear in the policy before the Court in the case *subjudice.* Liberty Life has made a substantial mistake in this regard and its response brief has only confirmed that it engaged in arbitrary and capricious behavior. Liberty Life argues that it analyzed the general labor market in the national economy. Liberty Life states, "This is the standard as stated by this Court in *Frazier* and applied uniformly *across every disability case Liberty Life handles in order to provide consistency in review across every claim."* (Doc. 19, pg. 33) Regrettably, the Farmers' Plan requires a different analysis all together. It remains unclear why the District Court and the Defendant do not understand that the particular definition of disability issued to the Farmers Group, Inc., requires a different analysis. It has been said multiple times that the particular policy at issue does not define "job" or "occupation." At relevant part, disability is defined as,

i. If the Covered Person is eligible for the 24 month Own Occupation Benefit, "Disability" or "Disabled" means during the Elimination Period and the next 24 months of Disability, the Covered Person is unable to perform all of the material and substantial duties of *his* occupation *on an Active Employment basis* because of an Injury or Sickness (LL 5). (Emphasis added)

"Active Employment" is a phrase that is not contained in the definition of *Frazier* or any other Liberty Life case. "Active Employment" in this policy means that,

"…the Employee, "must be actively at work *for the Sponsor* (Farmers Group, Inc.):

1. on a full time or part-time basis and paid regular earnings; **and**

2. for at least the minimum number of hours shown in the Schedule of Benefits; and either perform such work:

a. at the *Sponsor's usual place of business*; or

b. *at a location to which the Sponsor's business requires the Employee to travel*." (RE 9, LL 05) (Emphasis added)

The policy language agreed upon by Farmers and Liberty Life does not require a survey of the national economy or the general labor market to determine what is or what is not an occupation. The policy at issue in this case, does not talk about the Dictionary of Occupational Titles or the Occupational Handbook or some discrete desktop publication used by Liberty Life. This administrative record is absolutely

devoid of contact between Liberty Life and Farmers concerning the very specific requirements of working for Farmers. Liberty Life apparently does not understand the requirements of its own policy as it attempts to shore up its denials with vocational reports issued by its own employees.

Initially, Amanda Voce completed a report which only partially examined the duties of Senior Claims Representative. In her report, she described Mr. Pfenning's job description but omitted lifting, traveling, using tools and working outside from her analysis (RE 9, LL 425 – Voce's Summary; RE 9, LL 528-529, actual job description). Ms. Voce's conclusion that Pfenning's work represented an occupation which was performed at the sedentary and light physical demand levels undermines the idea that a reasonable analysis as mandated by the policy's own language was ever undertaken. Remember the actual language refers to, "his own occupation", performed for the Plan Sponsor.

"His own occupation" has been interpreted by one Judge of this Court to mean "his own job." In *Osborne v. Hartford Life & Accident Ins. Co.*, 465 F 3d 296 (2006), Judge Guy R. Cole noted in his dissent that the well-established precedent in the Third Circuit and the U.S. Supreme Court offered more to consider than the Dictionary of Occupational Titles. In *Lasser v. Reliance Standard Ins. Co.*, 344 F 3d 381, 386 (3d Cir. 2003), *cert. denied*, 541 US 1063, 124 S. Ct. 2390, 158 L. Ed. 2d 963 (2004), the Court held that,

> "Both the purpose of disability insurance and the modifier 'his/her' before 'regular occupation' make clear that 'regular occupation' is the usual work that the insured is actually performing immediately before the onset of disability."
> *Id.* at pg. 302 (*Osborne*).

After Ms. Voce's report was criticized by Mr. Pfenning's vocational expert, Liberty Life consulted Michelle Reddinger, another vocational employee, who undermined some of the findings previously issued by Ms. Voce. Ms. Reddinger indicated that the working environments of Claims Examiners "vary greatly." (RE 9, LL 95) This Court should look to the Second Circuit for guidance on this issue and consult the case of *Kinstler v. First Reliance Standard*, 181 F 3d 243 (2nd Cir. 1999). In *Kinstler*, the Court noted that a, "…regular occupation shall be a position of the same general character as the insureds previous job, requiring similar skills and training and *involving comparable duties*." *Id.* at 252. In *Kinstler*, the court criticized a conclusion that a Director of Nursing Services position was a job that required only sedentary tasks. The court noted that her job description indicated a variety of duties including engaging in patient care in certain circumstances.

In her final analysis, Ms. Reddinger wrote that Mr. Pfenning's occupation was performed at the sedentary and light physical demand levels and that the medical evidence supports Mr. Pfenning's capability to perform full-time sedentary work (RE 9, LL 67). What Ms. Reddinger's report does not indicate is

that she did not embrace any of the clinical findings that were contained in the FCE. In particular, she did not discuss pain or fatigue that Mr. Pfenning was experiencing or the FCE findings which demonstrated very low capabilities in, 1) ambulation agility; 2) ambulation stamina; 3) climbing; 4) keyboarding speed; 5) finger dexterity; and 6) manual dexterity (RE 9, LL 177). The job of Claims Adjuster is clearly performed at the skilled level because it requires knowledge of insurance products and claim adjusting (SVP of 6 to 7). Ms. Reddinger's and Ms. Voce's analyses do not take into consideration any complaints of pain, fatigue or difficulty with persistence which are byproducts of Multiple Sclerosis. Therefore, their conclusions are dubious and should be rejected.

Recently, a case from the Eastern District of Kentucky discussed the minimal requirements of an insurance company's vocational work. In *Bishop v. Aetna Life Ins. Co.*, 5:15-cv-104-KKC (EDKY, Feb. 12, 2016), Chief District Judge Karen K. Caldwell noted that, "Courts are hostile towards vocational reports that are conducted without all the claimant's records. A vocational expert's opinion that a claimant can perform certain jobs is only substantial evidence to the extent that the vocational expert had a complete, accurate understanding of the claimant's restrictions and limitations." *Neaton v. Hartford Life & Accident Ins. Co.*, 517 F App'x 475, 485 (6th Cir. 2013). Judge Caldwell went on to note that a failure to provide all of the information to vocational and medical experts

represented a "serious concern." Citing to *Metropolitan Life Ins. Co. v. Glenn*, 554 US 105, 118 (2008). The Judge also cited precedent from the Western District of Kentucky in *Benningfield v. Hartford Life & Accident Ins. Co.*, 4:11-cv-00087-JHM (WDKY, June 21, 2012), (a denial of LTD benefits based upon an employability analysis that did not contain all relevant medical information and abilities of the claimant did not demonstrate a reasoned review of the claim).

Finally, Judge Caldwell also went on to note that it was error for the vocational expert to not mention potential absenteeism secondary to a medical consideration. In *Bishop*, the vocational expert failed to note a potential for absenteeism because the peer review report did not mention it. The Judge noted, "Recurrent absenteeism is undoubtedly a major consideration in determining whether a person can acquire a job, but it is not included in Ms. Hamilton's analysis. Thus, at least one major piece of information was missing from Ms. Hamilton's analysis because Aetna provided her with an incomplete record." *Id.* at 8.

Indeed, the analysis in *Bishop* is instructive on the substantial problems that Liberty Life has in this case. Ms. Voce's conclusion was simply that the work was performed at the sedentary and light physical levels. The specific DOT titles that she references at RE 9, LL 427 manifest more than a physical component. Each of the DOT titles is referenced as either a SVP of 6 or 7. (See *Bishop* Footnote 1 & 2)

This context makes the work skilled. Each of the DOT titles further supports the idea that the incumbent would need to be able to type, write, and walk and stand free from impairments in balance or gait.

It is clear that by avoiding the actual clinical limitations associated with Mr. Pfenning's medical condition, Ms. Voce completed a distorted and unreliable view of Mr. Pfenning's vocational opportunities.[4]

Ms. Reddinger did not fare much better in her analysis of the vocational opportunities. In Ms. Reddinger's analysis, she cited the same four DOT titles as Ms. Voce (RE 9, LL 94). Ms. Reddinger had the benefit of the FCE which demonstrated very low capabilities in 1) ambulation agility; 2) ambulation stamina; 3) climbing; 4) keyboarding speed; 5) finger dexterity; and 6) manual dexterity (RE 9, LL 177).

The larger problem in the vocational context is that Liberty Life ignored the construct in its own policy in favor of a generalized perception of occupation and in doing so took an individual who made seventy thousand dollars ($60,000.00) a year by working in the field and converted him into an office worker. There was no legitimate basis to do so and Liberty Life's attempt to do so is arbitrary and capricious and cannot ever be part of a reasoned process. The behavior of Liberty

---

[4]Strangely, Ms. Voce does not list which medical profile she uses to develop her vocational analysis.

Life is no different than the behavior of Aetna in *Bishop* and should suffer from the same outcome, to wit:  a reversal of the improper denial of Mr. Pfenning's claim.

## CONCLUSION

Regrettably, the District Court did not understand this case.  Mr. Pfenning's claim must be analyzed under the *de novo* standard of review.  To do otherwise, deprives him of a benefit which his employer reserved for him and every employee of Farmers Insurance Group.  Whether under the *de novo* review or under an arbitrary and capricious review, the Defendant's actions concerning the medical evidence border on corrupt. In this case, Pfenning suffered from a long history of problems which were carefully analyzed by his physicians and ultimately confirmed to be Multiple Sclerosis.  The FCE demonstrated some inconsistent results on pushing and pulling, but MS is hardly known for its consistent appearance.  Pfenning complained of fatigue and problems with fine motor skills and agility and ambulation and persistence.  Despite all of those complaints, the FCE and confirmed diagnosis from cerebral spinal fluid, Liberty Life's physicians continue to imply a capability to do some sedentary and light work and imply that Pfenning was dishonest.

Finally, Liberty Life has engaged in an inexplicable analysis which does not respond to the demands of its own policy. If the salient demands of "his own occupation in…Active Employment" are to be given any meaning, they should be

given their plain meaning. "His own occupation" clearly implies Pfenning's job, not a generalized picture of some other work. "Active Employment" is defined clearly as work for Farmers not generalized work that might appear in the DOT or for other employers or that "sufficient opportunities exist."

Liberty Life's behavior was not correct in its denial of Mr. Pfenning's claim. Alternatively, it behaved in an arbitrary and capricious way which the District Court simply could not and did not understand. This Court should reverse the judgment of the District Court and enter judgment in favor of Pfenning and award benefits that are available to Pfenning under the "own occupation" portion of his claim. See *Shelby Co. Healthcare v. Majestic Star Casino*, 581 F 3d 355, 373-374 (6th Cir. 2009), (when plan administrator arrives at a wrong conclusion that is contrary to facts, benefits should be awarded).

Respectfully submitted,

*/s/ Joseph P. McDonald*

_____
Joseph P. McDonald (0055230)
McDonald & McDonald Co., L.P.A.
200 E. Spring Valley Rd., Suite A
Dayton, OH 45458
(937)428-9800
Fax: (937)428-9811
joseph@mcdonaldandmcdonald.com
Attorney for Plaintiff-Appellant

## CERTIFICATE OF FRAP 32(a)(7)(B) COMPLIANCE

I certify that this brief satisfies the requirements of Fed. R. App. P. 32(a)(7)(B). The actual word count is 6,122.

*/s/ Joseph P. McDonald*

Joseph P. McDonald

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed electronically with the Court and that electronic service thereby was made upon all counsel of record this 28th day of April, 2016.

*/s/ Joseph P. McDonald*

Joseph P. McDonald

## <u>APPELLANT'S 6 CIR. R. 30(b) DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS</u>

Appellant designates the following documents to facilitate the Court's review of this appeal:

| <u>RE No.</u> | <u>Description</u> |
|---|---|
| 9 | Administrative Record Filed Under Seal (LL1-LL602) |
| 16 | Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and Memorandum in Support (Pg. ID# 738-783) |